IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Crim. No. 1:20-CR-220 |
| | : | |
| **v.** | : | |
| | : | |
| **GLENN JEROME BRADLEY** | : | Judge Sylvia H. Rambo |

**M E M O R A N D U M**

Before the court is Defendant Glenn Jerome Bradley's motion to suppress. (Doc. 40.) For the reasons stated below, the motion will be denied.

**I.   BACKGROUND**

**A. Procedural Posture**

On September 9, 2020, a federal grand jury returned an indictment charging Bradley with possession with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 1.) On July 30, 2021, Bradley pled not guilty to the offenses. (Doc. 12.) Trial is scheduled for December 19, 2022.

Bradley moves to suppress the physical evidence collected from his person and home and any statements he made to police. (Doc. 40 ¶¶ 3, 19.) A search of Bradley's person uncovered 32.4 grams of cocaine and 7.2 grams of crack cocaine

(Govt. Ex. 3 at 6–7); at his home, officers discovered six firearms, cocaine, marijuana, $20,056 in cash, and various drug paraphernalia, among other things. (Govt. Ex. 5 at 6–7.) At the suppression hearing, the government presented testimony from Trooper Michael Schatzmann and Trooper Timothy Richartz of the Pennsylvania State Police, as well as Detective Donald Hayes, Detective Christopher Toland, and Officer Robert Moxley of the Baltimore County Police Department.

### B. Facts

In February 2020, Bradley became the target of a multi-jurisdictional drug investigation after a confidential source twice contacted the Baltimore County Police Department to report that Bradley regularly transported cocaine from York County, Pennsylvania, to Baltimore County, Maryland. According to the source, between 3:00 and 3:30 p.m. every day except Tuesdays, Bradley would leave his home at 825 Cedar Valley Road, Fawn Township, York County, Pennsylvania, driving his red Toyota Prius on back roads into Parkville, Maryland, to sell cocaine. Trooper Richartz confirmed that a 2010 red Toyota Prius was registered to Bradley, and a criminal history check revealed that Bradley had been convicted twice, two decades earlier, for possession with intent to deliver cocaine. (*See* Govt. Ex. 2 at 7.)

Trooper Schatzmann testified that just after 3:00 p.m. on February 27, 2020, he observed Bradley leave his home in the Prius. After tailing Bradley for several miles, Schatzmann observed him pull into a Royal Farms gas station and park beside

the building for about one minute before continuing to travel south into Maryland. Hayes then took over surveillance of Bradley, who after approximately fifteen minutes, pulled into a feed store parking lot in Harford County and remained in his vehicle. Detective Hayes testified that a tan sedan soon parked beside Bradley, and the sedan's passenger entered the Prius for about thirty seconds before returning to the sedan. Both the sedan and the Prius then exited the parking lot.

As Bradley continued toward Baltimore, his Prius was clocked at 42 miles per hour in a 40 mile-per-hour zone. (Govt. Ex. 1.2 at 0:12.) Sergeant Brocato and Officer Moxley stopped Bradley, and Moxley informed Bradley that he was pulled over for speeding. Bradley disclosed that he was traveling from home to his rental properties into Baltimore (*id.* at 2:50–3:00), but when asked whether he had made any stops along the way, Bradley refused to answer any further questions without an attorney. (*Id.* at 5:45–6:05.)

About six minutes into the stop, Moxley ordered Bradley out of the vehicle, and Hayes's K-9 partner Bella sniff-searched its exterior. (*Id.* at 7:00–05.) Hayes testified that Bella alerted to the odor of cocaine at the driver's door. Officers searched the vehicle's interior and found no controlled substances.

Approximately sixteen minutes into the stop, Moxley handcuffed Bradley. (*Id.* at 16:35–45.) Before transporting Bradley to the precinct, Moxley searched his person by checking his pockets, socks, and waistband, and pushing up his pant legs

to pat down his legs. (*Id.* at 18:15–20:20.) Moxley told Detective Toland that he did not feel anything, and Toland responded, "We think [Bradley]'s got something in his crotch" and confirmed that Bradley should be strip searched. (*Id.* at 20:50–21:12.)

At the precinct, Moxley escorted Bradley to an examination room, removed his handcuffs, and told him, "You don't have anything on you, do you? … Chances are you're going to get strip searched." (*Id.* at 42:45–45:15.) Bradley repeatedly denied having any contraband on him. After receiving the shift commander's authorization (*id.* at 45:25–35), Moxley and Toland conducted the strip search in the enclosed room, instructing Bradley to take off each article in turn. (*Id.* at 45:45–46:50.)

Stripped down to his underwear, with an abnormal bulge showing, Bradley stated, "I mean, obviously you guys are gonna fucking find it if you're going to strip search me—here!" and pulled a sock out of his underwear and handed it to Moxley. (*Id.* at 46:55–47:05.) Inside the sock were eighteen baggies of cocaine and six baggies of crack cocaine, packaged for sale. (Govt. Ex. 4 at 3.) The search continued and Bradley was required to remove his underwear and turn around. (Govt. Ex. 1-2 at 47:05–30.) Bradley proceeded through booking and was issued a written warning for speeding. (*See* Govt. Ex. 1.4 at 10:40–50.)

Meanwhile, Trooper Richartz applied for a search warrant of Bradley's home. In the affidavit of probable cause, Richartz recounted the confidential tip and details about the surveillance, traffic stop, and searches of Bradley's vehicle and person, as related to him by Toland. (*See* Govt. Ex. 4 at 2–4; Govt Ex. 5 at 2–4; Govt Ex. 2 at 8–9.) A magistrate authorized the home search, and the officers who conducted the search discovered a variety of contraband. (Govt. Ex. 4 at 1; Govt. Ex. 5 at 1, 5–6.)

## II.  STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the Supreme Court has repeatedly held, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Generally for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967)).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–90 (1968)). The government, however, "bears the burden of showing that each individual act constituting a search or seizure under the Fourth

Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). "The applicable burden of proof is by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

### III. DISCUSSION

Bradley's motion contends that officers unlawfully stopped and searched Bradley, and that as a result, his statements and the physical evidence discovered from searching his person and home must be suppressed as the fruit of the poisonous tree. *See Utah v. Strieff*, 579 U.S. 232, 237 (2016) ("[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and … 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'") (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, suppression is not warranted here because the officers did not violate Bradley's Fourth Amendment rights.

**A. Officers had reasonable suspicion to stop Bradley's vehicle.**

The Fourth Amendment permits a brief investigatory stop of a vehicle when law enforcement officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002). This determination draws on "context and commonsense, mindful that it is something less than what is required

to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable." *United States v. Henley*, 941 F.3d 646, 651 (3d Cir. 2019) (internal citations and quotation marks omitted). It also "permits officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (2002) (citing *Cortez*, 449 U.S. at 418). The central inquiry is whether the totality of the circumstances known to the officer at the time objectively manifests "that the person stopped is, or is about to be, engaged in criminal activity." *Id.* (quoting *Cortez*, 449 U.S. at 417).

Here, Moxley and Brocato possessed reasonable suspicion when they stopped Bradley that he was engaged in drug trafficking based on their knowledge of Bradley's prior convictions for cocaine distribution, the confidential source's tip, and officers' observations of Bradley's suspicious conduct that day.[1] Toland testified that he and his team were aware of Bradley's prior convictions for cocaine

---

[1] The fact that Bradley was speeding provides independent justification for a brief investigatory stop. *See United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (a traffic stop must be justified by "reasonable suspicion … that an individual has violated the traffic laws"). However, because officers also had reasonable suspicion that Bradley was engaged in a drug offense, the stop is not limited in duration or scope to an investigation of the observed traffic violation. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."); *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) ("A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.") (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Thus, the court need not analyze here the so-termed "*Rodriguez* moment," or the point at which the traffic stop exceeded the scope of its traffic enforcement mission.

distribution while conducting surveillance, which raised their suspicion that he was engaging in the same behavior. *See United States v. Green*, 897 F.3d 173, 187 (3d Cir. 2018) (the defendant's criminal record is a valid and useful factor in determining reasonable suspicion, and its "utility is enhanced when the prior offenses relate to the crime being investigated").

The nature of the confidential source's tip further contributed to the officers' reasonable suspicion. In some situations, an anonymous tip alone may exhibit "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)). "An informant's veracity, reliability, and basis of knowledge" are "highly relevant in determining the value of his report." *White*, 496 U.S. at 328 (internal quotation marks and internal citation omitted). In *Alabama v. White*, the Supreme Court held that officers had reasonable suspicion to stop a vehicle where an anonymous informant told police that a woman transporting cocaine "would drive from a particular apartment building to a particular motel in a brown Plymouth station wagon with a broken right tail light," even though the officers had only corroborated the innocent details from the tip prior to making the stop. *Navarette*, 572 U.S. at 397–98. The Court reasoned that the tip was sufficiently reliable because the caller's ability to predict the defendant's future actions demonstrates "a special familiarity with respondent's affairs," and "a person with

access to such information is likely to also have access to reliable information about that individual's illegal activities." *White*, 496 U.S. at 332. By contrast, in *Florida v. J.L.*, the Supreme Court held that the anonymous tip was not sufficiently reliable where the informant provided no basis for the knowledge and did not predict future events for the police to corroborate prior to making the stop. *Navarette*, 572 U.S. at 398 (citing *J.L.*, 572 U.S. at 271–72). The Third Circuit has specified several considerations in assessing a tip's reliability, including whether the tip predicts future events in a way that permits officers to test the informant's knowledge or credibility, whether it contains "information that would [not] be available to any observer," and whether the suspect's behavior "conforms to police officers' specialized knowledge of criminal activity." *See United States v. Torres*, 534 F.3d 207, 211 (3d Cir. 2008).

    Here, the confidential tip was sufficiently reliable because it provided several accurate identifying details about Bradley, furnished intimate details of his cocaine distribution routines, and accurately predicted Bradley's conduct. The tip accurately identified Bradley's name and home address, as well as the make, model, and color of his vehicle, and officers verified these details prior to initiating surveillance. The source additionally related "insider" facts including Bradley's practice of transporting cocaine packaged for sale in his underwear and his storage of contraband inside a home safe. The source accurately predicted Bradley's future

behavior by identifying the specific time and day of the week that Bradley would leave his home alone in his Prius and drive the back roads toward Baltimore. The source further reported that Bradley would stop along the way, in locations such as shopping centers, to sell cocaine to customers near Parkville. (Govt. Ex. 2 at 4; Govt. Ex. 3 at 4.) This prediction was apparently validated by Bradley's rendezvous in the feedstore parking lot, an interaction which Toland credibly testified to be consistent with a drug sale based on his extensive narcotics investigation experience. *See Torres*, 534 F.3d at 211 (conformity of a suspect's behavior to "police officers' specialized knowledge of criminal activity" further supports reasonable suspicion). Bradley's brief stop at Royal Farms further raised officers' suspicion based on Schatzmann's testimony that such behavior is consistent with a person "checking his tail" to ensure he is not being followed. *See id.* Considering all the known circumstances, the tip had sufficient indicia of reliability to provide reasonable suspicion that Bradley was engaged in drug trafficking. *See White*, 496 U.S. at 331–32.

Bradley argues that there are innocent explanations for his conduct. However, officers are not required to exhaust all possible innocent explanations of behavior before acting to detain a suspect. *See United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) ("[W]hen the police learn of potentially suspicious conduct, officers can stop and question the suspects to resolve ambiguity about the suspects'

conduct."); *Illinois v. Wardlow*, 528 U.S. 119, 125–26 (2000) (noting that even in *Terry v. Ohio*, 392 U.S. 1 (1968), the defendants' conduct—pacing in front of a store, conferring with one another, and peering in windows—which was itself lawful and "susceptible of an innocent explanation" nevertheless raised reasonable suspicion to justify the stop). The standard for an investigative detention is reasonable suspicion, which deals in probabilities. *Cortez*, 449 U.S. at 418 (describing reasonable suspicion as "common sense conclusions about human behaviors ... as understood by those versed in the field of law enforcement"). Based on all the facts known to the officers at the time, Bradley's initial seizure was justified by reasonable suspicion that he was engaging in drug distribution.[2]

**B. Officers had probable cause to arrest Bradley and search his vehicle and person.**

Bradley's motion also argues that officers lacked probable cause to arrest and search him, and that his statements and all physical evidence discovered must therefore be suppressed as the fruit of the poisonous tree. The Fourth Amendment generally requires officers to have a valid warrant before conducting a search or seizure. *See Robertson*, 305 F.3d at 167 (citing *Katz*, 389 U.S. at 356–57). An officer

---

[2] To the extent Bradley's motion contends that officers improperly ordered him out of his vehicle, the argument lacks merit. While conducting a valid stop of a vehicle, an officer has inherent authority to order a suspect from the vehicle without any further justification. *See United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000), *as amended* (Aug. 31, 2000) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)).

may, however, arrest a suspect in a public place when the officer has probable cause to believe a crime has occurred. *White*, 526 U.S. at 565–66. Under the search-incident-to-arrest exception to the warrant requirement, if the custodial arrest itself is lawful, "a search incident to the arrest requires no additional justification." *Riley v. California*, 134 S. Ct. 2473, 2483 (2014). Because the rationale for a search incident to arrest is to seize weapons and to prevent the destruction of evidence of the crime, it is limited in scope to "a search of the arrestee's person and the area within his immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969). Such "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803 (1974).

When a search incident to arrest involves an arrestee in a vehicle, police officers may search the vehicle "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)). Additionally, the automobile exception to the warrant requirement allows officers to seize and search a vehicle without a warrant if "probable cause exists to believe it contains contraband." *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

Here, officers had probable cause to arrest Bradley and search his vehicle and person incident to the arrest. Officers attained probable cause when Bella alerted to the odor of cocaine on the vehicle's exterior. *See United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (finding under the totality of the circumstances that "a dog's positive alert while sniffing the exterior of the car provides an officer with probable cause to search the car without a warrant"); *United States v. Massac*, 867 F.2d 174, 176 (3d Cir.1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest."). At the suppression hearing, Hayes testified about Bella's credentials and training to alert to the odor of cocaine, which accumulates while the drugs remain in a specific location. A reasonable officer could have concluded that Bella's alert at the driver's door, where Bradley had just been sitting for approximately thirty minutes, further corroborated the tip that Bradley transported cocaine on his person, even though Bradley himself was outside of the vehicle when Bella indicated. Under these circumstances, officers had probable cause to arrest Bradley and to search his person and vehicle.

So too was Bradley's strip search at the precinct a lawful search incident to his arrest. A search incident to arrest permits a "full search of the person" and may "involve a relatively extensive exploration of the person." *United States v. Robinson*, 414 U.S. 218, 227, 235 (1973). Nevertheless, strip searches must adhere to the

13

reasonableness requirements of the Fourth Amendment. *See Keating v. Pittston City*, 643 F. App'x 219, 226 (3d Cir. 2016) (citing *Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979)). To determine the reasonableness of such a search, the Supreme Court has instructed courts to balance "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559.

Applying this balancing test, Bradley's strip search was reasonable because officers possessed probable cause to believe they would find drugs on Bradley's person. Bella alerted officers to the presence of cocaine, and the officers subsequently ruled out that cocaine was located in less sensitive areas by searching the vehicle and conducting a relatively thorough roadside search of Bradley. Additionally, the source specifically alleged that Bradley transported drugs in his underwear, and up until the moment of the search, the source's information had been substantially corroborated and in no way discredited. Given what was known to officers at the time, they had probable cause for concluding that a strip search of Bradley would uncover evidence of contraband.

The manner and location of the strip search further support that the search was reasonable. Moxley performed the strip search, which was authorized per departmental policy, in a private examination room with only one other male officer present. *See Keating*, 643 F. App'x at 227 (finding the manner reasonable where

14

three male officers were present for the male parolee's strip search conducted within the privacy of his home). Bradley was given several opportunities to forego the strip search but instead continued to deny that he was hiding anything. Bradley removed his clothing himself per Moxley's instruction and preemptively retrieved the cocaine-laden sock from his underwear. *See id.* (finding that the absence of physical contact supported that the search was reasonable). Under these circumstances, the strip search was both reasonable and no more invasive than necessary to accomplish its legitimate objective, and suppression is not required.[3]

## IV. CONCLUSION

For the reasons explained above, Glenn Jerome Bradley's motion to suppress will be denied. An appropriate order will issue.

*s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: November 7, 2022

---

[3] Likewise, Bradley's statements to police and the physical evidence uncovered during the search of his home need not be suppressed. Bradley's only argument for suppressing this evidence is that it constitutes fruit of the poisonous tree and would not have been uncovered but for his unlawful search and arrest. As discussed above, however, Bradley's arrest and the search of his vehicle and person were consistent with the requirements of the Fourth Amendment.